IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GREGORY DOUGLAS JOHNSON, | § | |
| (TDCJ-CID #652074) | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-02-0344 |
| | § | |
| RONALD KELLY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

Plaintiff Gregory Douglas Johnson, an inmate of the Texas Department of Criminal

Justice - Correctional Institutions Division ("TDCJ-CID"), filed this lawsuit under 42 U.S.C.

§ 1983 in January 30, 2002.  He alleged that the defendants, officials at the TDCJ, violated

his constitutional rights by failing to protect his safety, denying him proper medical care,

denying him due process, and retaliating against him for using the grievance system.

Johnson sued Ronald Kelly, the food service manager and captain at the Ellis Unit of TDCJ-

CID; Louise Golden, a registered nurse at the Ellis Unit; David Turrubiarte, the building

major and disciplinary offense grading officer; Stephen Allee, a shift supervisor and

lieutenant at the Ellis Unit; Glenn Smith, the assistant warden at the Ellis Unit; Keith

Clendennen, the director of grievance operations for the TDCJ-CID; Michael Lightsey, a

disciplinary officer and grievance officer at the Ellis Unit; Barbara Reed, a former assistant

grievance coordinator; and Kelli Ward, who had administrative appellate review authority at the regional grievance office for TDCJ-CID.

On September 17, 2004, this court granted the summary judgment motion filed by Ronald Kelly, Louise Golden, David Turrubiarte, Stephen Allee, Glenn Smith, Keith Clendennen, Michael Lightsey, and Kelli Ward, dismissing Johnson's claims based on failure to protect, denial of medical care, denial of due process, retaliation, conspiracy, and an inadequate grievance system. (Docket Entry No. 62). On June 9, 2006, the United States Court of Appeals for the Fifth Circuit affirmed this court's judgment in part, vacated in part, and remanded for further proceedings on Johnson's retaliation claim against Captain Kelly. (Docket Entry No. 93). The Fifth Circuit noted that the summary judgment evidence showed that although Captain Kelly was aware of the incident made the basis fo the offense report on July 20, 2001, he did not file the offense report until the following Monday, July 23, 2001, after Johnson indicated that he would file a grievance over the incident. The Fifth Circuit observed that Captain Kelly's delay in filing the offense report was inconsistent with a TDCJ handbook, which Johnson offered as summary-judgment evidence. The Fifth Circuit vacated the dismissal of the retaliation claim against Captain Kelly and remanded for further proceedings.

Captain Kelly has now filed a supplemental motion for summary judgment under FED. R. CIV. P. 56. (Docket Entry No. 110). Johnson has responded. (Docket Entry No. 114). Based on the pleadings, Captain Kelly's motion and responses, the summary judgment record, and the applicable law, this court grants Captain Kelly's supplemental motion for

summary judgment, and by separate order, enters final judgment.  The reasons for this ruling are stated below.

## I.      Johnson's Claims

Johnson offers the following unsworn declaration in support of his claims:

> On July 20, 2001, I was accidently exposed to a chemical irritant for which I am allergic, called Hi-Lite.  After being exposed, I immediately stepped out of my clothing I was wearing except my boxer short.  At the time of the exposure, I was wearing my state issued shirt and pants, as well as a t-shirt. All other bakers began trying to call for Food Service Security to come to the bakery department to get me emergency medical treatment and to report the accident.  At that time, I was bathing my face, neck hands and arms (upper/lower extremities).  I did this in the 2-compartment sink.   However, one compartment was filled with most of the additional food materials to be returned to stock (e.g. eggs, milk, butter).
>
> After bathing, I washed out my state issued shirt and put it back on wet.   I then immediately sought emergency assistance. Because I was not going to put on two wet garments, I chose to put the t-shirt that belonged to me in the red sanitation pail because (1) it contained (2) the chemical I was allergic and (3) needed to be placed in (4) a secure container, since (5) we did not have available in the bakery department (6) any "chemical contamination containers as (7) required by (8) TDCJ-CID Policy, and (9) TDCJ-CID Safety Regulations.
>
> The t-shirt was not bleached or hand washed, it simply was placed in the only "secure" sanitation container for chemical the bakery had at that time.
>
> Over an hour passed when Captain Kelly wandered into the bakery department.   Initially, I tried to explain to Kelly what had happened an hour or so earlier, to include, but not limited to, explaining why my state issued shirt was wet.  Captain Kelly laughed at me an said "yeah right doc, chemical."  Other bakers

then tried to explain to him the same thing.  All of which went to no avail to Kelly.

Captain Kelly then began moving towards the rear of the bakery to exit the back door.  He kicked over the "red sanitation pail" onto the floor.  I again tried to explain to him what had happened and that the t-shirt belonged to me; however, Kelly refused to acknowledge this fact.  Kelly took the t-shirt and walked out of back door of the bakery.

After speaking to other Food Service Security, I was allowed to go to the medical department and then back to my cell.

Over the weekend, I contracted a severe chemical reaction to chemical exposure which produced dime sized lesions all over my face, neck, hands and arms (and upper extremities).  On Monday, July 23, 2001, I returned to work.  It was in the early morning hours I approached Captain Kelly in his office and I showed him exactly what the chemicals had done to me.  We got into an argument about him (1) not allowing me to go to the medical department, (2) Kelly not filling out an injury report, (3) not following safety rules and regulations regarding chemical accidents.

I asked Captain Kelly for my t-shirt back and he refused.  We began to argue again about what he did nad[sic] did not do the previous Friday.  I again asked for my t-shirt back.  He asked me for twenty postage stamps.  Although we again began to argue, it was at this time I made Captain Kelly aware that I was going to file a formal complaint against him to unit administration regarding the above-mentioned issues and I walked out of Kelly's office.

Less than 30 minutes later, Sgt. Ruby Wyatt called me into her office, which is attached to Captain Kelly's office and explains to me that she is investigating a offense report that Captain Kelly had just written on me for "misuse of state property."

At all time on July 20, 2001, at the point of the chemical exposure, I followed at "safe," "efficient," "common-sense," and "TDCJ-CID Safety Polices" regarding this exposure in light

of the fact I was locked in a bakery department I could not exit to seek emergency medical treatment or alternative safety measures.

(Docket Entry No. 114, Plaintiff's Response, Ex. H,  pp. 1-4).

In the affidavit he filed previously, Kelly stated in part as follows:

> Mr. Johnson complaints that, while he was working in the kitchen, he was splashed with a chemical solution while locked in the secured bakery area and had to wait for staff assistance. As stated, offenders are locked in the bakery area for reasons of safety and to keep track of supplies.  Although he could not leave the area, he had access to hand wash sinks, with hot water and soap, and a two-compartment sink, so that he could immediately rinse or wash the affected area with hot or cold water.

> My recollection of the events in question is that I came across a t-shirt soaking in a bucket, and Mr. Johnson admitted that it was his.  He told me that he had "wasted" something on it and gotten it sweaty while working and wanted to clean it.  His soaking the clothing in the bucket was an improper use of state property.

> It was not made clear to me that any chemicals had been splashed or spilled on him or that he had been exposed to any chemical.  In cases of chemical exposure, inmates should flush the affected area.  We allow the inmate to go to the infirmary and complete an injury report.  Mr. Johnson claims that he told me what had occurred, but based upon my recollection of the conversation, it was not made clear that he had been exposed to chemicals himself and was in need of medical assistance.  He did not appear to have any injuries.

> These events occurred around 4 p.m. on July 20, 2001.  That was a Friday, and during that time of day, we are serving meals in both the offender and officer dining rooms.  It was also well past the time of day I usually leave work, so I did not write the disciplinary case for his improper use of state property at that time.  Instead, I wrote the case the following Monday, July 23,

5

2001. My only reason for writing the disciplinary case against
Mr. Johnson was based upon his committing the infraction of
use of the state property for unauthorized purposes.

(Docket Entry No. 114, Ex. I).

Johnson seeks declaratory and injunctive relief and $53,000.00 in damages. (Docket

Entry No. 1, Complaint, pp. 1, 4).

## II.    The Standard of Review

Summary judgment is appropriate when the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25

(1986); *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998). A dispute

regarding a material fact is "genuine" if the evidence is such that a reasonable jury could

return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986). When ruling on a motion for summary judgment, the court is required to

view all inferences drawn from the factual record in the light most favorable to the

nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986);

*Ragas,* 136 F.3d at 458. Further, a court "may not make credibility determinations or weigh

the evidence" in ruling on motions for summary judgment. *Reeves v. Sanderson Plumbing*

*Prods., Inc.,* 530 U.S. 133, 150 (2000); *Anderson,* 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to

support the nonmoving party's case, the party opposing the motion must come forward with

competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita,* 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas,* 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.; see also Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied,* 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322-23.

Johnson is proceeding *pro se.* Courts construe pleadings filed by *pro se* litigants under a less stringent standard than those drafted by attorneys. *See Haines v. Kerner,* 404 U.S. 519 (1972). Under this standard, pleadings filed by a *pro se* litigant are entitled to a

liberal construction. *See Haines*, 404 U.S. at 521; *see also United States v. Pena*, 122 F.3d 3, 4 (5th Cir. 1997) (citing *Nerren v. Livingston Police Dept.*, 84 F.3d 469, 473 & n.16 (5th Cir. 1996)). "Although the pleadings filed by pro se parties are held to 'less stringent standards than formal pleadings drafted by lawyers,' pro se parties must still comply with the rules of procedure and make arguments capable of withstanding summary judgment." *Ogbodiegwu v. Wackenhut Corrections Corp.*, 202 F.3d 265 (5th Cir. 1999). "[T]he notice afforded by the Rules of Civil Procedure and the local rules" advises a *pro se* party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

## III.    The Summary Judgment Record

Captain Kelly moves for summary judgment on Johnson's retaliation claim. Captain Kelly submits an affidavit from Armando Ayala, Administrator for the Office of Disciplinary Coordination, along with Texas Department of Criminal Justice-Disciplinary Rules and Procedures for Offenders; and an affidavit from Lola Moore, Offender Records Supervisor at the Ellis Unit, along with relevant portions of Johnson's disciplinary records.

Johnson has presented the following exhibits:

(A)    a list of summary judgment exhibits;

(B)    Captain Kelly's Offense Report dated July 23, 2001;

(C)    general rules relating to compliance with safety procedures, falsification of records, violation of statutory authorities, harassment of another individual, retaliation

against an offender, mistreatment of offenders, failure to turn in seized evidence, and denial of access to the courts;

(D)    Captain Kelly's Training Log dated September 8, 2006, showing that Captain Kelly had completed 280 hours of in-service correctional training;

(E)    the Standard Offense Pleadings Handbook;

(F)    the Offender Worker Rules for the Ellis Unit Food Service Department;

(G)    the TDCJ-CID Material Safety Data Sheet for the product "Hi-Lite" dated January 2004;

(H)    Johnson's unsworn declaration;

(I)    Captain Kelly's affidavit describing his duties as food service captain and the events surrounding the filing of a disciplinary case against Johnson;

(J)    an affidavit of Dr. Larry Largent concerning his review of Johnson's medical records following the incident on July 20, 2001;

(K)    a form for a Supervisor's Report On Inmate Injury;

(L)    forms for Employee Disciplinary Process, including TDCJ employee offense and prehearing investigation reports;

(M)    a copy of the TDCJ-CID Policy - Access to Courts dated November 7, 2003;

(N)    Captain Kelly's "admissions";

(O)    Captain Kelly's time sheet for Friday, July 20, 2001;

(P)    a TDCJ-CID Disciplinary Report & Hearing Record for Robert Hart, an inmate who filed a retaliation claim in *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003); and

(Q)   a disciplinary appeal filed by Robert Hart.

The motion and response are analyzed based on the record and applicable law.

## IV.   The Claims Against Captain Kelly in his Individual Capacity

Section 1983 provides a right of action for damages to individuals who are deprived

of "any rights, privileges, or immunities" protected by the Constitution or federal law, by any

person acting under the color of state law.  42 U.S.C. § 1983.  Officials may be protected

from liability by qualified immunity, which shields such officials from suit "'insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"  *See McClendon v. City of Columbia*, 305 F.3d 314,

322 (5th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

To determine whether a defendant sued in his individual capacity is entitled to

qualified immunity from a suit alleging a constitutional violation, requires a two-step inquiry.

First, the court asks whether the plaintiff has alleged facts establishing that the official

violated the plaintiff's constitutional rights.  *Hope v. Pelzer,* 536 U.S. 730, 736 (2002) ("The

threshold inquiry a court must undertake in a qualified immunity analysis is whether

plaintiff's allegations, if true, establish a constitutional violation.");  *Saucier v. Katz,* 533 U.S.

194, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider,

then, this threshold question:  Taken in the light most favorable to the party asserting the

injury, do the facts alleged show the officer's conduct violated a constitutional right?").

Whether the facts establish a violation of a constitutional right is determined based on current

law.  *See Atteberry v. Nocona Gen. Hosp.,* 430 F.3d 245, 253 (5th Cir. 2005); *McClendon,*

305 F.3d at 323.  If the facts do not show that the defendant violated the plaintiff's constitutional rights, the court need not inquire further.  *See Saucier*, 533 U.S. at 201.  The second inquiry is whether the defendant's conduct was objectively unreasonable in light of law clearly established when the incident occurred.  *See McClendon,* 305 F.3d at 323.

Johnson alleges that Captain Kelly retaliated against him on July 23, 2001, by filing a disciplinary case for unauthorized use of state property.  Johnson was ultimately found guilty of the charge.  Prison officials may not retaliate against an inmate because that inmate exercised a constitutionally protected right.  *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir. 1995), *cert. denied,* 516 U.S. 1084 (1996).  The Fifth Circuit has specifically held that prison officials may not retaliate against an inmate for exercising the right of access to the courts, or for complaining through proper channels about a guard's misconduct.  *See Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006).  The latitude afforded prison officials in the control and discipline of inmates "does not encompass conduct that infringes on an inmate's substantive constitutional rights."  *Woods*, 60 F.3d at 1166.

In *Woods v. Smith,* an inmate claimed that a guard filed a false disciplinary case in retaliation for writing letters to a federal judge and to the prison warden of the prison complaining about the guard.  The Fifth Circuit characterized his claim as alleging retaliatory interference with the First Amendment right of access to courts and prison officials to complain about misconduct.  *Woods,* 60 F.3d at 1164.  The Court held that a favorable-termination requirement would be an inappropriate bar to a claim of retaliation for the exercising a constitutional right.  To state a retaliation claim, however, the inmate must

allege a violation of a specific constitutional right and be prepared to establish that, but for the alleged retaliatory motive, the incident would not have occurred. *Woods,* 60 F.3d at 1166. This requirement places a heavy burden on inmates because conclusory allegations will not suffice. Instead, the inmate must produce direct evidence of retaliation or of a chronology of events from which retaliation may plausibly be inferred. *Woods,* 60 F.3d at 1166.

The Fifth Circuit cautioned judges reviewing such claims that "[t]he prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Woods,* 60 F.3d at 1166. District courts must "carefully scrutinize" claims of retaliation to ensure that prisoners do not "inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around themselves." *Woods,* 60 F.3d at 1166; *accord, Orebaugh v. Caspari,* 910 F.2d 526, 528 (8th Cir. 1990) (noting that "while a prisoner can state a claim of retaliation by alleging that disciplinary actions were based upon false allegations, no claim can be stated when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform."). A different rule would allow a prisoner openly to flout prison regulations after filing a grievance and then sue under section 1983 arguing that prison officials disciplined him in retaliation for filing a grievance. *Orebaugh,* 910 F.3d at 528.

The elements of a retaliation claim are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation.  The causal link requires a showing that but for the retaliatory motive, the action complained of would not have occurred. *Johnson v. Rodriguez,* 110 F.3d 299, 310 (5th Cir. 1997).  An inmate must demonstrate more than his personal belief that he is being retaliated against. *See Jones v. Greninger,* 188 F.3d 322, 324-25 (5th Cir. 1999).

The first element requires that a plaintiff show retaliation for engaging in constitutionally protected activity.  Johnson claims that Captain Kelly retaliated after he threatened to file a grievance.  A prison official may not retaliate against an inmate for using the grievance system. *Jackson v. Cain,* 864 F.2d 1235, 1249 (5th Cir. 1989).  Johnson satisfies the first element.

The second element requires Johnson to establish Captain Kelly's intent to retaliate exercising of that constitutional right.  Johnson argues that as a seasoned prison employee with 280 hours of correctional officer training, Captain Kelly knew, on the date of the incident, that prison policies required him to complete any offense report before the end of his shift.  Kelly did not file an offense before his shift ended on July 21, 2001.  Johnson claims that Captain Kelly would not have filed the disciplinary charge on July 23 if Johnson had not confronted Kelly on that date and complained about the July 20 incident and Kelly's failure to file an injury report, and stated that he planned to file a grievance.  Johnson argues

that Captain Kelly filed the offense report against Johnson to cover up the fact that he himself had violated prison policy on filing an injury report after a chemical exposure.

The record shows that the incident at issue took place in the Ellis I Unit bakery on the afternoon of Friday, July 20, 2001. Johnson contends that after he was exposed to a chemical to which he was allergic, he took off his shirt, washed his face, neck, hands, and arms, washed his shirt and put it back on wet, and placed the t-shirt he had been wearing in a pail. Kelly explained that he saw the t-shirt in the bucket, he believed it was a state-issued shirt and that soaking it in the pail was an improper use of the state-issued property. Kelly contends that he was not told that Johnson had been exposed to chemicals and needed medical assistance. Kelly explained that he waited to write the offense report because of the press of work on Friday, July 20. The disciplinary offense, unauthorized use of state property, took place at 4:00 p.m. on Friday, July 20, 2001. (Docket Entry No. 110, Captain Kelly's Supplemental Motion for Summary Judgment, Ex. B, p. 1). The report was written on Monday, July 23, 2001.

Officer Ruby Wyatt conducted a preliminary investigation on Monday, July 23, 2001. That investigation lasted from 8:35 a.m. to 8:45 a.m. (*Id.* at 3). Wyatt stated that Johnson said that, "[i]t was his T-shirt, he wasted something on it, so he was soaking it." (*Id.*). Captain Kelly, the accusing officer, told Officer Wyatt that, "said offender did use state property without authorization for his personal use." (*Id.*). Officer Wyatt concluded that informal resolution was not appropriate because such behavior would not be tolerated. (*Id.*).

Nathan Shroyer, Officer Wyatt's approving supervisor, approved the Preliminary Investigation Report on July 23, 2001.

Under the Disciplinary Rules and Procedures for Offenders, Captain Kelly could either bring the matter to the attention of the supervising officer on duty or complete an offense report (Form I-210).[1] Captain Kelly completed Form I-210, the offense report, on

---

[1]   The TDCJ-CID's "Disciplinary Rules and Procedures for Offenders," (Docket Entry No. 110, Defendant's Supplemental Motion for Summary Judgment, Ex. A, pp. 1-6), provides in relevant part as follows:

### A.   Reporting Infractions

When a TDCJ employee or contract employee witnesses or has knowledge of any act by an offender which is in violation of the rules and regulations of the Institutional or State Jail Divisions, the employee first will attempt, if appropriate, to resolve the matter informally. Such informal resolution may include counseling, verbal reprimand, or the giving of an instruction, warning or order.

1. If the incident cannot be resolved informally by the observing employee, he/she will bring the matter to the attention of the supervising officer on duty or complete an Offense Report (Form I-210), whichever is appropriate at the time of the incident. The supervising officer also will attempt, if appropriate, to resolve the matter informally by counseling or verbal reprimand.

2. If the supervising officer cannot resolve the incident informally, an Offense Report and a Preliminary Investigation Report (reverse side of the I-210 form) will be completed.

3. Upon completion of the Offense Report and Preliminary Investigation Report, the supervisor will review the information and determine whether or not informal resolution is appropriate. If the incident cannot be resolved informally, a Disciplinary Report will be filed, formally charging the offender with violating the TDCJ rule. All offense reports, even those informally resolved, will be forwarded to the unit disciplinary office for processing.

a.   The Disciplinary Report will be generated on the appropriate form (Form I-47MA or Form I-47MI).

b.   The Disciplinary Report will include the following information: The accused offender's name, TDCJ number, time-earning class(for ID offenders), custody classification, housing and job assignment; the reporting officer's name and title; the code number of the offense; the date of the offense; and a description of the facts of the offense. The description of the facts of the offense should include, at a minimum, the date and time of the alleged infraction, the name(s) of the complainant (charging officer) and all witnesses, the location of the incident, and a full statement of the facts underlying the charges.

c.   The Disciplinary Report need not include the reporting officer's signature and the date of the signature so long as the reporting officer has signed and dated a form that includes the description of the facts of the offense, (Form I-210, Offense Report). This signed and dated form is to be maintained in the offender's unit file.

d.   The Offense Report will include any unusual offender behavior, any physical evidence and its disposition, and any immediate action taken, including the use of force.

. . .

**B.      Classification of Hearing - Minor v. Major**

1.   A minor disciplinary hearing is a means of processing less serious rule infractions in accordance with this rule book. A minor disciplinary hearing cannot result in the imposition of the following:

a)  any major penalties (see Section VII.A.2 for a list of the major penalties),

b)  cell restriction or loss of recreation privileges for offenders assigned to administrative segregation or death row, or

c)  assessment of monetary damages due to damage or destruction of state property.

2. A major hearing is an administrative hearing, presided over by a disciplinary hearing officer, to process serious rule violations in accordance with the provisions of those rules related to a major hearing. An offender shall not be given any major punishment without a major hearing. A major disciplinary hearing must also be conducted before imposing cell restriction or loss of recreation privileges for offenders in administrative segregation or death row.

3. The final decision whether a disciplinary hearing will be classified as major or minor will be made by the officer in charge (Captain or above). The decision will be based on the following factors:

> a. The nature and seriousness of the offense (e.g., a Level 3 violation is more apt to be processed pursuant to a minor hearing than a Level 1 violation).
>
> b. The offender's disciplinary history.
>
> c. The period of time since the offender's last rule violation.

Institutional Division

4. Should an offender be found guilty in a minor hearing, that finding of guilt will not preclude the offender from being reviewed for promotion in time-earning class. An offender who has received a disciplinary conviction resulting in a major penalty may be reviewed and considered for promotion in time-earning class after twelve (12) months from the date of the offender's most recent disciplinary conviction resulting in a major penalty.

## C.    Investigation

The Disciplinary Report cannot be processed pursuant to a major disciplinary hearing without a proper investigation which includes interviews with the charging officer, the accused offender, or other witnesses. A Preliminary Investigation Report will be started within twenty-four (24) hours of the time the violation is reported and completed without unreasonable delay, unless there are exceptional circumstances for delaying the investigation. Exceptional circumstances that are reasons for delays shall be documented. The investigating officer will be a staff member but not the person who reported the incident

July 23, 2001.  Officer Wyatt completed a Preliminary Investigation Report (the reverse side

of the I-210 form).  The supervisor, Nathan Shroyer, reviewed the Offense Report and

Preliminary Investigation Report and determined that informal resolution was not

appropriate.  After the determination that the incident could not be resolved informally,

Captain Kelly filed a Disciplinary Report at 9:00 a.m. on Monday, July 23, 2001, formally

charging Johnson with a Level 2, Code 18.1 offense, unauthorized use of state property.

(Docket Entry No. 110, Captain Kelly's Supplemental Motion for Summary Judgment, Ex.

A, p. 28; *Id.*, Ex. B, p. 2).  Officer McMillian notified Johnson of the charges on July 24,

- - - - - - - - -

. . .

### III.    Minor Disciplinary Hearing Procedures

#### A. Hearing

1. Disciplinary hearings classified as minor shall be heard by a minor
hearing officer.  The hearing officer shall be at least the rank of
lieutenant and meet the criteria outlined in Section IV. D.2, below.

2. Offenders shall be served with notice of charges at least twenty-four
(24) hours prior to their hearing.  The charges will be explained to an
offender in terms he/she can understand, and within thirty (30) days
of discovery of the alleged violation. Offenders may not be subject to
any form of coercion designed to persuade them to waive their right
to twenty-four (24) hours notice.  If offenders are offered the
opportunity to waive twenty-four (24) hours notice, they must be fully
informed, in terms intelligible to them, of the nature of the rights at
stake.  All applicable time limits for a minor hearing are the same as
for a major hearing.

(Docket Entry No. 110, Captain Kelly's Supplemental Motion for Summary Judgment, Ex. A, pp.
1-6).

2001 at 9:05 p.m. (Docket Entry No. 110, Captain Kelly's Supplemental Motion for Summary Judgment, Ex. B, p. 1). Johnson received notice of the charge within thirty days.

In support of his argument that Captain Kelly violated prison policies, Johnson refers to portions of the Standard Offense Pleadings Handbook, which states:

### IV. HOW TO COMPLETE AN OFFENSE REPORT

After all efforts at informal resolution have failed and the decision has been made to charge an offender with a disciplinary infraction, there are certain steps that should be followed. These steps will ensure that the offense report contains an accurate account of what happened. This will provide the shift supervisor and the grading authority with the information necessary to determine whether or not to process the case or to process the case through a major or minor disciplinary hearing. The Offense Report should be completed as soon as possible after the incident and after informal resolution was deemed inappropriate. *The report should be submitted to a supervisor during or by the end of the shift.*

. . . .

B. SUPERVISOR'S REVIEW OF OFFENSE REPORT (I-210)

Upon completing the Offense Report, the reporting employee will submit it to his/her shift supervisor. The supervisor will carefully review the Offense Report to ensure that:

1. the disciplinary charge(s) against the accused offender are appropriate.

2. the standard offense pleading(s) are appropriate and adequately completed.

3. an expanded offense description is provided, and

4. the reporting employee signed and dated the report, and indicated whether or not informal resolution was appropriate.

. . . .

## C.  *INFORMAL RESOLUTION PROCEDURE*

TDCJ's *Disciplinary Rules and Procedures for Offenders* state when an officer witnesses or has knowledge of any act by an offender which is in violation of the rules and regulations of TDCJ, the employee first will attempt, if appropriate, to resolve the matter informally.  If the incident cannot be handled informally by the observing employee, the matter will be brought to the attention of the supervising officer on duty, who will also attempt, if appropriate, to resolve the matter informally.  The supervising officer will determine whether the incident can be informally resolved or a disciplinary report is to be written.  The informal resolution code could be used at this point.

1.  If the Shift Supervisor determines an incident has been informally resolved, the area of the Offense Report (I-210), asking if informal resolution was appropriate, will be circled "yes" and the case forwarded to the disciplinary office. If the shift supervisor determines informal resolution was inappropriate, a preliminary investigation will be initiated.  If the preliminary investigation of an Offense Report (I-210) reveals the incident was or should have been informally resolved, the shift supervisor will circle the appropriate area of the Offense Report (I-210).  An offense report does not have to be written on all violations that are informally resolved.

2.  *At the end of each shift, the supervisor will send the Offense Report (I-210) to the disciplinary office.*  The disciplinary clerk will enter the information in the disciplinary System (D100 Screen 03 - Enter Offense Information) and a case number will be assigned.  The Offense Report (I-210) will be forwarded to the Major for review.  If the Major determines the incident should not have been informally resolved, a brief justification should be written on the bottom of the I-210 and an appropriate grade assigned.  The offense reports (I-210) will be kept in a suspense file in the disciplinary office for six months and then destroyed.

. . . .

> 5.  After reviewing the report and ensuring it has been properly completed, the supervisor must sign the report before it can be processed any further.  Should the supervisor not approve the Offense Report, he will not sign it and a Disciplinary Report will not be completed.

(Docket Entry No. 114, Plaintiff's Response, Ex. E, pp. 8, 11-12) (emphasis in original).

In response to the defendants' prior motion for summary judgment, (Docket Entry No. 62), Johnson made the same argument that under TDCJ policies, that Captain Kelly should have filed the offense report before he left work on July 20, 2001.  (Docket Entry No. 75, Brief in Opposition to Defendants' Motion for Summary Judgment, p. 20).[2] Johnson referred to section "I-C" of the Disciplinary Rules and Procedures for Offenders called, "Investigation," which provides:

---

[2]  In remanding, the Fifth Circuit stated:

> Captain Kelly was aware of Johnson's misuse of state property on the date of the chemical exposure, July 20, 2001, but did not file an offense report until the following Monday, July 23, 2001 after Johnson indicated he would file a grievance regarding the incident. Captain Kelly explained that he delayed in filing offense report because the incident occurred after his usual departure time. However, Captain Kelly's delay arguably violates the provisions of a handbook issued by the TDCJ which Johnson made a part of the summary judgment record.

> The disciplinary report cannot be processed pursuant to a major
> disciplinary hearing without a proper investigation which
> includes interviews with the charging officer, the accused
> offender, or other witnesses. A Preliminary Investigation
> Report will be started within twenty-four (24) hours of the time
> the violation is reported and completed without unreasonable
> delay, unless there are exceptional circumstances for delaying
> the investigation. Exceptional circumstances that are reasons
> for delays shall be documented. The investigating officer will
> be a staff member but not the person who reported the incident.

(*Id.*, Ex. K, p. 4).

Section I-C provides the time frame for completing a Preliminary Investigation Report. Captain Kelly reported the incident on Monday, July 23, 2001. Officer Wyatt started the preliminary investigation at 8:35 a.m. that there is no indication that he could have begun it sooner. (Docket Entry No. 110, Captain Kelly's Supplemental Motion for Summary Judgment, Ex. B, p. 3). Johnson argues that section I-C of the Disciplinary Rules and Procedures for Offenders required Captain Kelly to complete the offense report within twenty-four hours after the incident. Captain Kelly was the charging officer who reported the incident, not the investigating officer; his conduct is not governed by Section I-C. Captain Kelly was required to file the offense report within thirty days of the date he discovered the incident, which he did.

Captain Kelly could not file the offense report until the preliminary investigation and supervisory review were completed. There is no evidence that Captain Kelly failed to file the report within the time set by TDCJ policy.

Johnson contends that Captain Kelly testified in an affidavit that he did not write the offense report on July 20, 2001 because it was past 4:00 p.m., the time he usually left work. (*Id.*, p. 12). Johnson offers a log purportedly showing that Captain Kelly actually left work at 10:00 p.m. on July 20, 2001. Johnson argues that Captain Kelly had sufficient time to prepare an offense report on the date of the incident. Johnson relies on TDCJ Employee Time Reporting System History Records for July 2001. (Docket Entry No. 114, Plaintiff's Response, Ex. O, p. 1). The record shows that on July 20, 2001, Captain Kelly worked 8 "regular" hours and 10 "overtime" hours. The record does not show when Captain Kelly's regular shift began, when the regular shift ended, when overtime began, or when overtime ended. Contrary to Johnson's assertion, the record does not conclusively show that Captain Kelly began his shift at 8:00 a.m. on July 20, 2001 and that he left work at 10:00 p.m. The evidence shows neither direct proof of retaliation or a time line from which retaliation can plausibly be inferred.

Johnson has not established through competent summary judgment evidence that Captain Kelly intended to retaliate against Johnson for Johnson's exercise of his constitutional right to file grievances.

Johnson must also show that he suffered an a retaliatory adverse act. Johnson asserts that his threat to file a grievance prompted Captain Kelly to charge him with a disciplinary offense. The Fifth Circuit has recently held that an inmate's retaliation claim must allege more than a *de minimis* adverse act. *Morris v. Powell*, 449 F.3d 682 (5th Cir. 2006). In *Morris*, the plaintiff alleged that he had been assigned to a less desirable job in the kitchen,

from pot scrubber to butcher, in retaliation for filing complaints about a commissary official. *Id.* at 684. After an appeal and remand, the district court found that a prisoner must allege more than a *de minimis* retaliatory act to proceed with a retaliation claim. *Id.* Because assignment to a less desirable job was *de minimis*, the court dismissed the retaliation claim. *Id.* On appeal, the Fifth Circuit affirmed. The court cited a District of Columbia Circuit Court case holding that an inmate's retaliation claim must allege acts that "would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996) (en banc), *vacated on other grounds*, 523 U.S. 574 (1998)). The Fifth Circuit concluded that even if a job transfer was motivated by retaliation and the inmate suffered some discomfort as a result, such job transfers were *de minimis* and could not support a retaliation claim. *Id.* at 687.

Johnson argues that the punishment he received included loss of commissary privileges, which he claims is more than *de minimis*. *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003). (Docket Entry No. 114, Plaintiff's Response, p. 14). In *Hart*, the inmate was punished with 27 days of loss of commissary and cell restrictions after he was convicted in a disciplinary proceeding. The Fifth Circuit rejected the argument that this punishment was *de minimis*. The Fifth Circuit apparently considered the cell restriction portion of the punishment as comparable to a transfer to administrative segregation.

In the present case, by contrast, Johnson was punished with a ten-day loss of commissary privileges. (Docket Entry No. 110, Captain Kelly's Supplemental Motion for Summary Judgment, Ex. B, p. 1). Johnson was found guilty of a minor disciplinary offense.

The loss of commissary privileges was among the punishments that could be imposed for a

minor offense.³  For  ten days following the disciplinary hearing, Johnson was barred from

---

³  The TDCJ Disciplinary Rules and Procedures for Offenders provides, in part:

> 3.  Loss of privileges not to exceed thirty (30) days per disciplinary case. At no time shall the loss or restriction of each privilege exceed a total of ninety (90) days from the date of the most recent conviction as the result of cumulative disciplinary convictions. Privileges which may be restricted are:
>
> . . .
>
> b.  commissary purchases-except legal and correspondence materials; and hygiene items (toothbrush, toothpaste/powder, deodorant, shampoo, and soap).
>
> . . .
>
> 4.  Cell restriction not to exceed thirty (30) days per disciplinary case.

State Jail Division

An offender sentenced to a state jail may not receive cell restriction under a minor disciplinary hearing.

Institutional Division

a.  Offenders may receive consecutive terms of cell restriction for cumulative disciplinary convictions. At no time shall cell restriction exceed a total of ninety (90) days from the date of the most recent conviction as the result of cumulative disciplinary convictions.

b.  Offenders restricted to their cells shall not leave their cells except for medical reasons, showers, meals, law library visits during non-work hours only, work, educational or vocational school or training, and visits (contact and non-contact).

c.  Cell restriction does not involve restrictions on correspondence.

d.  The offender will not be allowed out-of cell recreation. When an offender serves more than thirty (30) continuous days of cell restriction pursuant to a minor hearing, the offender will be allowed physical recreation out of his/her cell for a one-our period every seven (7) days.

making commissary purchases.  He was not prohibited from buying legal or correspondence materials or hygiene items such as a toothbrush, toothpaste/powder, deodorant, shampoo, or soap.  The Fifth Circuit has found that a few days discomfort following a job transfer is *de minimis*.  Johnson has failed to show more than a *de minimis* adverse act. *Morris v. Powell*, 449 F.3d 682 (5th Cir.  2006).  "Some acts, though maybe motivated by retaliatory intent, are so *de minimis* that they would not deter the ordinary person from further exercise of his rights. Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim." *Morris*, 449 F.3d at 686.  Even if Captain Kelly's filing an offense report was motivated by retaliatory intent, the alleged retaliatory act was so *de minimis* that it would not deter the ordinary person from further exercise of his rights.

Finally, Johnson has failed to meet the fourth element, causation.  Johnson has failed to show that but for his action in threatening to file a grievance, the incident complained of would not have occurred.  *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).  The evidence shows that Captain Kelly filed a disciplinary case alleging that Johnson had violated TDCJ-CID policy prohibiting the use of state property for personal use.  The evidence shows that Johnson filed the report as soon as the preliminary investigation and

---

. . .

Under no circumstances may an offender's participation in educational or vocational school or training be denied, altered, or restricted as the result of a minor disciplinary hearing. When more than one (1) of the minor penalties listed above is imposed at the disciplinary hearing, the penalties will be served concurrently.

(Docket Entry No. 110, Captain Kelly's Supplemental Motion for Summary Judgment, Ex. A, pp. 6-8).

supervisory review were completed.  Johnson asserts that the allegations in the disciplinary action are false; however, he was found guilty of unauthorized use of state property. Although not conclusive, the existence of a legitimate prison disciplinary report is "probative and potent summary judgment evidence."  *Woods v. Smith,* 60 F.3d 1161, 1166 (5th Cir. 1995).

Johnson has not raised fact issues as to all the elements of a retaliation claim. Summary judgment is appropriate because the record shows that there is no genuine issue as to any material fact and that Captain Kelly is entitled to judgment as a matter of law.

## V.     Conclusion

The motion for supplemental summary judgment filed by Ronald Kelly, (Docket Entry No. 110), is granted.  Johnson's retaliation claim is dismissed with prejudice.

SIGNED on June 25, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge